# IN THE COURT OF APPEALS OF IOWA

No. 21-1189
Filed January 27, 2022

**IN THE INTEREST OF A.H. and L.H.,**
**Minor Children,**

**S.H., Mother,**
Appellant.

_____

Appeal from the Iowa District Court for Wapello County, William S. Owens, Associate Juvenile Judge.

The mother appeals the termination of her parental rights. **AFFIRMED.**

Patricia J. Lipski, Washington, for appellant mother.

Thomas J. Miller, Attorney General and Ellen Ramsey-Kacena, Assistant Attorney General for appellee, State.

Sarah L. Wenke, Ottumwa, attorney and guardian ad litem for minor children.

Considered by Bower, C.J., and Greer and Badding, JJ.

**GREER, Judge.**

The mother appeals the termination of her parental rights to two children, A.H. and L.H., born in 2014 and 2019. The juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(e) (both children), (f) (A.H. only), and (h) (L.H. only) (2021).[1] The mother purports to challenge the statutory grounds for termination, maintains the Iowa Department of Human Services (DHS) was deficient in its efforts to return the children to her care, and argues she should have been given additional time to work toward reunification. Alternatively, she argues the juvenile court should have placed the children in a guardianship with their fictive kin[2] caretaker in lieu of terminating her parental rights.

"We review termination of parental rights de novo." *In re A.B.*, 957 N.W.2d 280, 293 (Iowa 2021). Termination of parental rights under chapter 232 generally consists of a three-step process. *See id.* at 294. But our review on appeal is confined to those issues actually raised and briefed by the parent who challenges the termination. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996) ("We exercise our de novo review only with respect to issues raised and preserved at trial. Similarly, our review is confined to those propositions relied upon by the appellant for reversal on appeal." (citation omitted)).

---

[1] The juvenile court also terminated the parental rights of the children's father. He does not appeal.

[2] One of the children's caretakers is the school principal of the oldest child.

**Statutory Grounds.**

First, we consider whether the State proved the statutory grounds for termination. We can affirm on any ground supported by clear and convincing evidence. *A.B.*, 957 N.W.2d at 294. The juvenile court terminated the mother's parental rights to A.H. under paragraph (f) and to L.H. under paragraph (h) of section 232.116(1). The difference between these statutory grounds relates to the age of the respective child and the amount of time each must be removed from their parent's care before termination may take place. *Compare* Iowa Code § 232.116(1)(f)(1), (3), *with id.* § 232.116(1)(h)(1), (3). The mother does not contest those grounds were properly met. She focuses on the shared fourth element—challenging whether the State proved by "clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102." *Id.* § 232.116(1)(f)(4), (h)(4).

From our review of the record, we do not believe the mother can challenge this finding. At the termination hearing (in July 2021), she seemed to acknowledge that the children could not yet be returned to her care. *See In re D.W.*, 791 N.W.2d 703, 709 (2010) (interpreting "at the present time" to mean at the time of the termination hearing). When asked what she was requesting from the court, the mother testified she was asking for an additional three months to work toward reunification and stated her intention to enter residential substance-abuse treatment when a spot opened up in the next couple weeks.[3] She testified she

---

[3] The social worker testified the mother had been approved to enter residential substance abuse treatment and would be the next person admitted. The treatment facility "had a female tentative discharge date for the 10th of August," though there was a chance an opening would occur before then. There was no indication from

was currently unemployed; she still needed to get a job and save up to get housing for herself and the children after she was discharged from treatment. In a letter she authored and then read in court, the mother stated in part:

> I pray you forgive me and give me the second chance to let [the children] come back in my life and in three months tell you how things have changed in my life to better. . . .
> I need your help, Judge. I am here to better myself and be a different woman for myself, my kids, and my future. . . . Give me this opportunity to change what I should have done years ago.

"[T]he mother cannot be heard on appeal to complain about a ruling she agreed was appropriate." *In re H.S.*, No. 17-1902, 2018 WL 540998, at *1 (Iowa Ct. App. Jan. 24, 2018); *see also Jasper v. State*, 477 N.W.2d 852, 856 (Iowa 1991) (noting a litigant "cannot deliberately act so as to invite error and then object because the court has accepted the invitation"). Thus, while we appreciate her open admission she required more time, her position confirms her inability to care for the children at the time of the termination hearing.

Additionally, the mother's argument on appeal also seems to focus on whether the children could be returned to her if she was given six more months, as she now requests in her appellate petition. She argues:

> Appellant-Mother also disagrees with the juvenile court's conclusions of law . . . that there is clear and convincing evidence the children cannot be returned to her care, especially if the court had granted her an additional six months' time to work toward reunification.
> . . . .
> Mother acknowledged that she has experienced major struggles in her own life, and she has not been the parent she believes she can and should be. However, she also acknowledged her greatest struggles (mental health and substance abuse), her commitment to dealing with those issues, and her desire to become the parent she can and should be, and requested an extension of time

---

the mother, social worker, or family support specialist that the children could be placed with the mother at the residential treatment facility.

to show she can have the children safely returned to her care. For those reasons, she believes the Court's findings and conclusions that termination be granted under [section 232.116(1)(f) and (h)] should be overturned, and the termination of parental rights order should be reversed.

But when considering whether the statutory grounds for termination are met under paragraphs (f) and (h), the question for the juvenile court—and now for us—is whether the parent can resume caring for the child *at the time of the termination hearing.  See In re Z.P.,* 948 N.W.2d 518, 524–25 (reiterating that even with well-intentioned parents who "display[] none of the characteristic red flags found in so many of these termination cases," the determinative question is whether the parent was "in a position to take custody of [the child] at the time of trial").  We recognize the court can grant the parent additional time to work toward reunification under section 232.104(2)(b), but whether additional time should be granted is separate from the determination that a statutory ground for termination is met.  At no time—neither before the juvenile court nor here on appeal—has the mother claimed she could have resumed caring for the children at the time of the termination hearing.  So we do not consider this further.

**Reasonable Efforts.**

Next, in a related argument, the mother maintains DHS failed to make reasonable efforts to return the children to her care.  "[T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination.  Instead, the scope of the efforts by [DHS] to reunify parent and child after removal impacts the burden of proving those elements of termination which require reunification efforts."  *In re C.B.,* 611 N.W.2d 489, 493 (Iowa 2000).  "The State

must show reasonable efforts as part of its ultimate proof the child cannot be safely returned to the care of a parent." *Id.*; *accord* Iowa Code § 232.116(1)(f)(4), (h)(4).

The mother points specifically to DHS's delay in scheduling a needed psychological evaluation. While the evaluation was recommended to the mother in July 2020, DHS did not schedule it until February 2021. The mother maintains she should get additional time to work toward reunification because of the delay. In response, the State contends this issue has not been properly preserved for our review because the mother never complained about the delay to the juvenile court.

Our error-preservation rules generally require a parent to complain to the juvenile court directly—not a social worker or family support specialist (FSS)—"to demand other, different, or additional services." *In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999). And "[i]n general, if a parent fails to request other services at the proper time, the parent waived the issue and may not later challenge it at the termination hearing." *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002). Parents must ask for the services they believe they need to achieve reunification early enough in the process that those services can obtained—if possible—and provide a benefit to the parent within the statutory timeline set out for terminations. *See id.* at 147 ("Generally, in making reasonable efforts to provide services, the State's focus is on services to improve parenting."). Plus, we cannot allow parents to use "last-minute requests for services to become a tactic for delay." *In re P.L.*, No. 19-0103, 2019 WL 1294809, at *1 (Iowa Ct. App. Mar. 20, 2019).

But here, it was DHS that made the recommendation to the court in a June 16, 2020 report that "[the mother] participate in a psychological evaluation and follow all recommendations, to be paid for by court ordered services . . . to the

extent there is no other funding available." The juvenile court adopted the recommendation in its July 7 dispositional order. And then, in its October 16 order following a motion to modify disposition, the court ordered: "The department shall arrange for a psychological assessment for [mother]." That order was repeated in the court's January 15, 2021 dispositional order. We see nothing in the record before us that shows the mother raised the issue of DHS's delay to the juvenile court before DHS ultimately scheduled the February 24, 2021 evaluation. But everyone was aware of the needed service early in the case, the need was raised to the court, and then the court ordered it to be addressed. At a minimum, the spirit of our error-preservation rules were met in this case. *See id.* ("Our error-preservation rules are 'not designed to be hypertechnical.'" (citation omitted)). So we consider whether DHS's delay in scheduling the psychological evaluation constitutes a failure of reasonable efforts that ultimately affected the children's return to the mother's care. *See, e.g.*, *In re R.C.*, No. 16-1131, 2016 WL 4803919, at *5–6 (Iowa Ct. App. Sept. 14, 2016) (reversing termination and granting parent an additional six months to work toward reunification upon finding the State failed to satisfy the reasonable-efforts requirement).

While we cannot condone the failure to arrange for an appointment in 2020, we note that when DHS finally scheduled the mother's psychological evaluation for February 24, 2021, she failed to attend. The evaluation was then rescheduled for May 5. The mother never confirmed she would attend the second evaluation. Still, information was emailed to her regarding how the evaluation would be conducted over a video platform. The mother called in at the appropriate time for the second evaluation, but due to the lack of video capability, the evaluation was

not completed at that time. A third appointment was then scheduled for June 15. It was scheduled so the mother would have a visit with her children at the office of the FSS in the morning and then complete her evaluation there—so the FSS could help with the technological aspect. Then, according to a letter written by the licensed psychologist and admitted into evidence:

Prior to the day of the appointment, an email was sent to [the FSS] and a member of our office staff spoke to her to make sure everything was ready for the appointment. Additionally, a voicemail was left with [the mother] to remind her of the upcoming appointment using the phone number supplied by [the social worker]. On the morning of the appointment, beginning at approximately 7:00 a.m., [the mother] called the office cell phone repeatedly using a new telephone number and left at least two messages. When staff contacted her, she explained she had an appointment at 10:00 a.m. for which she wanted to provide us with a new telephone number to use (the number she was calling from and a different number than the one provided by DHS for her updated contact information). [The mother] again asked about using the phone for the appointment. My staff explained to [her] that the appointment had to be conducted via video and instructed her to contact [the FSS]. When asked about the schedule for the morning, [the mother] explained the visit with the children was no longer happening. After speaking to [the mother], office staff contacted [the FSS] who related she had not been able to contact [the mother] and that the visit with the children had been cancelled. It was determined that a Zoom invitation would be sent and if [the mother] was present in [the FSS's] office at the time of the appointment, the evaluation would proceed at 10:00 a.m. [FSS] contacted our office at approximately 10:00 a.m. to report [the mother] was not in the office and had texted she was on her way, although [the FSS] had no idea when she might arrive. At this point I terminated the appointment and explained to [the FSS] that I would not reschedule [the mother] again.

. . . .

Although there may have been a misunderstanding at some point about how telehealth evaluations are conducted, it appears [the mother] is incapable or unwilling to follow the protocol for appointments such as these. I have conducted many of these evaluations during the pandemic successfully and without rescheduling or problems locating the client. This has been unusually difficult, and I believe we have had full cooperation from DHS.

As of the July 28, 2021 termination hearing, the mother had yet to complete a psychological evaluation.

While the delay in scheduling the psychological evaluation is not insignificant, we cannot say it affected the children's return to the mother's care under these facts. *See In re B.G.*, No. 15-0732, 2015 WL 5996936, at *4 (Iowa Ct. App. Oct. 14, 2015) ("The core of the reasonable efforts mandate is the child welfare agency must make reasonable efforts to 'facilitate reunification while protecting the child from the harm responsible for the removal.'" (quoting *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996)). In 2021, the mother attended only three individual therapy appointments, countering her argument that she valued psychological services. So, as she did not properly attend any of the three evaluations scheduled for her, we have no reason to believe she would have attended one if it was scheduled earlier in the case. *See In re C.P.*, No. 18-1536, 2018 WL 6131242, at *3 (Iowa Ct. App. Nov. 21, 2018) ("[The mother's] failure to use the services provided defeats her reasonable-efforts claim."). We reject the mother's reasonable-efforts challenge.

**Additional Time.**

The mother does not set out a separate argument for additional time in her petition on appeal, but she raises it in conjunction with both her statutory-grounds and reasonable-efforts claims. So we consider whether the juvenile court should have granted the mother's request for additional time to work toward reunification under section 232.104(2)(b). The court can grant a parent six more months to work toward reunification if it determines there will no longer be a need for removal at the end of the extension. Iowa Code § 232.104(2)(b).

Like the juvenile court, we cannot say the children could be returned to the mother's care in six months. DHS became involved with this family in the second half of 2019, when it was alleged the mother was caring for the children under the influence of methamphetamine, had engaged in a high speed chase—reaching speeds over 110 miles per hour—with the oldest child unrestrained in the car, and put holes in walls in the family home while acting out in anger with the children present. The children were not removed until February 2020, after the mother was kicked out of a shelter for breaking a window and then proceeded to walk to a nearby bridge with the children, reportedly holding L.H. over the edge. The mother allegedly told a police officer who became involved that she was homicidal and suicidal.

The mother made little to no progress between the time of the children's emergency removal in February 2020 and the termination hearing in July 2021. The mother has bipolar disorder and fails to take her medicine as prescribed. She rarely participated in mental-health counseling and never completed the psychological evaluation. The mother admitted she was unable to control her anger, and she continued to act aggressively while angry—lunging at the DHS worker on at least one occasion, putting holes in walls, and being arrested for domestic violence against her sister in July 2021. The mother's short fuse made it difficult to have tough conversations and give constructive criticism. Additionally, in the time leading up to the termination hearing, the mother admitted she was using methamphetamine—an issue that went unrecognized before because the mother denied use, her early tests came back negative, and the mother's behaviors were generally attributed to her mental-health needs.

At the time of the termination hearing, the mother recognized she needed substance-abuse treatment, mental-health treatment, and services to help with her anger. She was unemployed and did not have a home to which the children could return. The mother told the social worker she wanted to get help regardless of the result of the termination hearing, and we hope the mother follows through. But we cannot say she will able to parent the children safely in six months. We agree with the juvenile court that an extension is not warranted here.

**Guardianship in lieu of Termination.**

Finally, the mother argues termination of her parental rights is not in the children's best interests. *See* Iowa Code § 232.116(2). She maintains the juvenile court should have placed the children in a guardianship with their fictive kin caretaker in lieu of terminating her parental rights. *See id.* §§ 232.104(2)(d)(1) (allowing the court to end an order transferring guardianship and custody of the children to a suitable person); 232.117(5) (allowing the court to deny the petition to terminate parental rights and enter a permanency order instead).

To deny the termination petition and enter an order establishing a guardianship under section 232.104(2)(d) instead, the court must find all of the following apply:

> a. A termination of the parent-child relationship would not be in the best interest of the child.
> b. Services were offered to the child's family to correct the situation which led to the child's removal from the home.
> c. The child cannot be returned to the child's home.

*Id.* § 232.104(4). Also, "[i]mportantly, 'a guardianship is not a legally preferable alternative to termination.'" *In re A.S.*, 906 N.W.2d 468, 477 (Iowa 2018) (citation omitted).

The juvenile court found it was in the children's best interests for the mother's parental rights to be terminated. And we agree. The children—especially the oldest child—love and share a bond with the mother. But the mother missed almost half of the visits offered to her in 2021 and, even in a supervised setting, she often needed reminders about safety issues and what was appropriate for the children. On more than one occasion, she told the children their caretakers were their parents now, which visibly upset the oldest child.

Plus, while the mother argues the caretakers should become the children's guardian, we have no indication the caretakers have agreed or would agree to that arrangement. The children are doing well in the home of the fictive kin, and they are bonded to the caretakers—referring to them as "mom" and "dad." *See id.* § 232.116(2)(b) (considering "whether the child[ren] [have] become integrated into the foster family to the extent that the child[ren]'s familial identity is with the foster family"). The caretakers were working on becoming licensed foster parents, and they told DHS they would adopt the children if the need arose. *See id.* (considering "whether the foster family is able and willing to permanently integrate the child into the foster family").

Because termination of the mother's parental rights is in children's best interests, a guardianship is not appropriate.

We affirm the termination of the mother's parental rights to both children.

**AFFIRMED.**